**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CORNELL ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-1387 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| ILLINOIS CENTRAL RAILROAD CO., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's motion for summary judgment [26]. For the reasons set forth below, Defendant's motion for summary judgment [26] is granted. Judgment will be entered in favor of Defendant and against Plaintiff. Because this ruling resolves all claims in the case, this civil case will be terminated.

## I.     Background

Defendant Illinois Central Railroad Company—a rail carrier—hired Plaintiff Cornell Anderson in March 2012. [28 (Def.'s Stmt. of Facts), at ¶ 4.] From June 2012 until August 23, 2015, Plaintiff worked as a crew caller in the Crew Management Center ("CMC"). [*Id*. at ¶¶ 4, 6.] The CMC operates around the clock to coordinate the assignment of crew members (conductors, engineers, and trainmen) to jobs and to communicate those assignments to the crew members themselves. [*Id*. at ¶ 6.] The CMC is part of the Regional Operations Center ("ROC"). [*Id*.] The head of the CMC is the regional manager of the CMC. [*Id*. at ¶ 7.] The regional manager reports to the superintendent of the Regional Operations Center. [*Id*.] Below the regional manager are the front-line supervisors, known as managers of crew management, who oversee the day-to-day

operations of the CMC. [*Id.*] When Plaintiff was first hired into the CMC, the regional manager was Pamela Claremont. [*Id.* at ¶ 8.] Gary Anderson served as regional manager from April 2013 until March 2015, when he left his employment with Defendant. [*Id.*] Tom Duncan became regional manager of the CMC in late June 2015. [*Id.*] Between February 2015 and June 2015, there was no regional manager of the CMC. [29-4 (Morehouse Decl.), at ¶ 4.] During that time, Anne Morehouse, the superintendent of the Regional Operations Center, took on the majority of responsibilities associated with that position. [28 (Def.'s Stmt. of Facts), at ¶ 8.]

### A. Treatment by Supervisors

When Plaintiff joined the CMC as a crew caller, he did not have a consistent shift. [*Id.* at ¶ 9.] After a few months as a relief crew caller, Plaintiff was awarded a regular shift, working from 11 p.m. to 7 a.m. [*Id.*] Plaintiff's nighttime supervisors (managers of crew management) included Ed Sipla, Lenny Nowak, Dominicke Clair, and Carmen Rodriguez. [*Id.*] Rodriguez supervised Plaintiff about four times a week. [*Id.*] Plaintiff was also subject to supervision by Jessica Welch and Carolyn Brown. [*Id.*] Plaintiff enjoyed working as a crew caller on the third shift as it was a "good environment." [*Id.* at ¶ 10.] Plaintiff felt that Clermont, Sipla, Clair, and Nowak treated him fairly. [*Id.*]

However, Plaintiff felt that Duncan treated him unfairly. [*Id.* at ¶ 11.] Plaintiff testified that Duncan's discrimination was "blatant."[1] [39-1 (Pl. Dep. Tr.), 246:8-23).] Plaintiff further testified that Duncan showed disdain to Plaintiff and others. [*Id.* at 55:1-5.] When asked to provide examples, Plaintiff testified:

---

[1] Plaintiff also asserts that "Duncan treated Plaintiff and Defendant's other African-American employees differently than white employees, and with 'disdain,' like they were back in the civil rights era of the 1960's." [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 2.] However, the cited deposition testimony referred to Gary Anderson, not Duncan.

> The way he looked at us, the way that he spoke or did not speak. If he was walking through a door and he was in front of you, he wouldn't hold the door. He would just let the door close on you. Very – he just had a very bad attitude towards us, I thought. And, to me, it felt like it was because of our nationality.

[*Id*. at 55:16-23.] Duncan also told Plaintiff that he didn't like Plaintiff and that Plaintiff was "lazy" and "a liar." [*Id*. at 246:17-23.] Duncan also implied that Plaintiff was incompetent and would blame him for things that went wrong. [*Id*. at 76:6-77:11.] Plaintiff contends that Duncan made these comments even though he did not know Plaintiff and rarely worked with him. However, Plaintiff does not cite to evidence establishing that Duncan rarely worked with Plaintiff. Duncan initially met Plaintiff in 2013, when they began working in the same office. [ 39-2 (Duncan Dep Tr.), at 6:18-25.] And Duncan became Plaintiff's boss in June 2015. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 1.] Still, Duncan was not Plaintiff's boss long, as Plaintiff was suspended beginning July 3, 2015 and did not return to the crew management department at the end of his suspension. [ 39-2 (Duncan Dep Tr.), at 21:17-22:8.]

Plaintiff testified that Duncan subjected other African-American employees to racism.[2] [39-1 (Pl. Dep. Tr.), at 217:13-20.] However, Plaintiff has not identified any examples of such racism for the Court's consideration. Plaintiff also testified that Duncan engaged in a pattern of discriminatory actions against Plaintiff's African-American colleagues. [*Id*. at 279:2-22.] In support of that conclusion, Plaintiff testified that Duncan[3] fired five or six other African-American employees. [*Id*. at 279:2-22.] However, Plaintiff did not know and/or has not provided any details

---

[2] Plaintiff cites to testimony in which Duncan vaguely agrees that he probably has treated employees unfairly at one point and similar testimony to that effect. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 10.] However, the testimony does not include any details of the circumstances to which Duncan was inferring. There is no indication that Duncan was agreeing that he discriminated *on a racial basis*. The Court therefore finds this testimony unhelpful to Plaintiff's position.

[3] This portion of Plaintiff's deposition testimony actually references both Gary Anderson and Duncan. However, at another point in Plaintiff's deposition, Plaintiff testifies that it was Duncan who fired approximately six African-Americans. [*Id*. at 157:20-158:14.]

regarding why these individuals were terminated. Although Plaintiff testified that he was not aware of Duncan firing any "nonblacks" [*id.* at 158:15-20], Duncan testified that he terminated multiple employees of other races. [39-2 (Duncan Dep. Tr.), at 28:15-20; 29-2 (Duncan Decl.), at ¶¶ 15-16.] Plaintiff has not presented any contrary evidence.

Plaintiff also thought that Gary Anderson treated him unfairly. [28 (Def.'s Stmt. of Facts), at ¶ 13.] If there was an incident, Gary Anderson immediately would assign blame to Plaintiff with "no reasoning." [*Id.*] Gary Anderson also never talked to Plaintiff about a proposal he made for a new position to be added to the CMC. [*Id.*] Plaintiff felt that Gary Anderson spoke to him and other African-American employees with such "disdain" that he felt that it was necessary to complain to Gary Anderson's boss and Human Resources about his conduct. [39-1 (Pl.'s Dep. Tr.), at 74:11-24] Plaintiff also testified regarding "preferential treatment" given by Gary Anderson. [*Id.* at 75:23-76:2.] But Plaintiff does not cite to any evidence regarding to what preferential treatment he was referring.

Finally, Plaintiff also believed that Duncan's superior Anne Morehouse treated him unfairly. Plaintiff believed that Morehouse was not always fair to him and that "it was all because of Tom Duncan." [28 (Def.'s Stmt. of Facts), at ¶ 17.][4] Specifically, he felt that she unfairly rejected his applications for a rail traffic controller position on multiple occasions over the years (all prior to his meeting with her on July 3, 2015), but he admitted that he never talked to her about why he was not selected for the position and that the position required a lot of the same skills as the crew caller position, including attention to detail. [*Id.*] Duncan, Morehouse, and Gary

---

[4] Plaintiff admitted Defendant's Statement of Fact No. 17 in part and denied it in part. However, Plaintiff does not identify what portion of the statement he denies. Furthermore, the evidence that Plaintiff cited in opposition does not contradict the statement. The Court therefore deems the fact admitted.

Anderson are the only individuals that Plaintiff felt treated him differently because of his race. [39, (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 15.]

## B. The Crew Caller Position

Crew callers work on eight separate "desks," each of which corresponds to different territories in the U.S. where trains run and involve employees subject to different collective bargaining agreements. [28 (Def.'s Stmt. of Facts), at ¶ 18.] Crew callers may only work on desks for which they have proven qualified. [*Id.*] The crew caller position requires attention to detail and the ability to multitask. [*Id.* at ¶ 19.] As a crew caller, Plaintiff was responsible for determining which train crew members were available at a given time, assigning available train crew members to staff trains, and calling those same crew members to inform them of their assignments. [*Id.*]

Plaintiff was expected to properly record crew members as off-duty and to ensure that he did not assign crews to jobs that would cause an excessive service violation or call crews interrupting their rest, which could also cause an excessive service violation. [*Id.*] Plaintiff was aware that excessive service violations were a problem for Defendant and should be avoided. [*Id.*] For those crews that were on duty, Plaintiff was expected to accurately monitor their availability and alert management as to the need to either call them to duty or annul them (notify them that they will not be called to duty) within a certain window of time. [*Id.* at ¶ 20.] This is because—pursuant to their collective bargaining agreements—train crew members are entitled to additional "spread pay" for any time outside of their "spread" that they remain without an assignment and not annulled. [*Id.*] Plaintiff was aware that crew callers were expected to minimize spread pay "at all costs." [*Id.*] Crew callers were also responsible for recording the off-duty times for train crews who called them (referred to as "tying up"). [*Id.* at ¶ 21.] The failure to properly record tie

up times can result in an hours of service violation, because crew members are required to be given a certain amount of rest time without interruption and Defendant relies on tie up times to indicate when a crew member's rest began. [*Id*.] Crew callers also must identify when someone is taking a personal leave day (PLD) or a single-day vacation (SDV). [39-1 (Pl.'s Dep. Tr.), at 100:14-20.]

Plaintiff was aware that crew callers are expected to follow a variety of rules and policies issued by management, including bulletin notices and emails regarding procedure. [28 (Def.'s Stmt. of Facts), at ¶ 23.] Specifically, according to System Bulletin Notice No. 1, employees are expected to work safely and obey all rules and instructions. [*Id*.] Crew callers are unionized employees, subject to a collective bargaining agreement. [*Id*. at ¶ 24.] Discipline is administered to crew callers according to the provisions in this agreement. [*Id*.] Pursuant to this agreement, coaching and letters of caution are not discipline and may be issued by managers without investigation. [*Id*.]

Pursuant to the collective bargaining agreement covering crew callers, investigation hearings must occur before Defendant assesses discipline, unless the employee agrees to accept responsibility for the incident and waive a fact-finding investigation. [*Id*. at ¶ 25.] Investigation hearings are fact-finding hearings initiated by Defendant. [*Id*.] The purpose of the hearing is to determine whether an employee is at fault for violating company rules, policies, laws, or practices. [*Id*.] Pursuant to a manager's discretion to offer a waiver, an employee may agree to waive an investigative hearing, admit to the conduct at issue to be investigated, and receive discipline. [*Id*.] Investigative hearings are conducted by a hearing officer and transcribed by a court reporter. [*Id*. at ¶ 26.] The hearing officer is responsible for conducting a fair and impartial hearing and weighing the testimony presented by all parties. [*Id*.] The hearing officer does not have authority to terminate employment or assess discipline, but might provide feedback to a decision-making

manager.  [*Id*.]  Based on the facts elicited at the hearing, Defendant makes a decision as to whether the employee should be disciplined and what the discipline should be.  [*Id*.]

### C.  Plaintiff's Tenure as Crew Caller

Throughout Plaintiff's time as a crew caller, he regularly made errors.  [*Id*. at ¶ 27.]  He received regular coaching from various supervisors regarding how to properly perform his job duties.  [*Id*.]  In total, Plaintiff received in excess of thirty-five separate coachings from at least eight different supervisors.  [*Id*.]  His performance, however, did not improve.  [*Id*.]  On October 31, 2012, Plaintiff received a letter of caution from supervisor Jessica Welch, informing him that he marked the wrong employee off sick.  [*Id*. at ¶ 28.]  Plaintiff admitted that he received this letter because he made a mistake and marked the wrong employee off sick.  [*Id*.]  On March 11, 2013, supervisor Jessica Welch sent Plaintiff a coaching email regarding his failure to properly execute PLDs/SDVs.  [*Id*. at ¶ 29.]  Welch directed Plaintiff to verify any book-offs and "check in the book as well prior to calling."  [*Id*.]  She noted that "we need to be aware of who we have available before we call them."  [*Id*.]  Plaintiff admitted that this email identified a mistake that he made and was sent to help him.  [*Id*.]

On March 12, 2013, Plaintiff received a letter of caution from supervisor Lenny Nowak, regarding his failure to call an employee to work, which caused a train to be two hours late.  [*Id*. at ¶ 30.]  Anderson was informed that he was expected to "take your time to complete the task at hand and make sure all employees are called to work in a timely fashion."  [*Id*.]  During his deposition, Plaintiff tried to defend his conduct relating to this incident, explaining that he was under the impression that the system was going to call the employee, but it did not.  [39-1 (Pl.'s Dep. Tr.), at 97:1-18.]

On April 16, 2013, Gary Anderson met with Plaintiff regarding numerous errors committed on April 12 and April 13, 2013, and provided him with a letter of caution. [28 (Def.'s Stmt. of Facts), at ¶ 31.] The letter stated that Plaintiff had made a total of twelve separate and specific "careless" errors on his April 12 and 13 shifts and cautioned him that the errors needed to be "corrected immediately," and that "future issues of this nature * * * could result in discipline." [*Id.*] In particular, Plaintiff failed to properly record the status of various train crews and failed to properly execute PLDs. [*Id.*] Plaintiff admitted that he probably made these errors. [*Id.*] After the meeting on April 15, 2013, Plaintiff sent Gary Anderson an email "apologizing for the tone of the meeting" and stating that he would "do my absolute best to ensure this department runs according to your standards," and that he did not "want any ill will or tension between us." [*Id.* at ¶ 32.]

On April 24, 2013, Plaintiff failed to obey a direct order from the chief dispatcher to call a crew and tell them to be prepared to lay over. [*Id.* at ¶ 33.] Plaintiff admitted he failed to follow the instruction and accepted responsibility for his actions. [*Id.*] On or about May 10, 2013, Plaintiff formally waived his right to an investigation. [*Id.*] He was assessed a 10-day suspension deferred for one year, from April 24, 2013 to April 23, 2014. [*Id.*] On August 23, 2013, Plaintiff received a letter of caution from supervisor Jessica Welch regarding his attendance and reminding him of the importance of abiding by the Attendance Guidelines. [*Id.* at ¶ 34.] On August 26, 2013, all crew callers received an email from Chief Crew Caller Christopher Ratuszny reminding them of the proper procedure for executing book-offs. [*Id.* at ¶ 35.] On September 3, 2013, Gary Anderson was informed by Chief Crew Caller Skye Woldhuis that the caller on desk 1 overnight (Plaintiff) had improperly executed a PLD. [*Id.*] Gary Anderson sent an email to Plaintiff informing him of the error and stating that Plaintiff needed to "[p]ay attention to the status' [sic]

of the employees" and that "[t]his is not the first time this subject has been brought to everyone's attention." [*Id.* at ¶ 36.]

On September 3, 2013, Plaintiff received a letter of instruction from supervisor Carolyn Brown regarding absenteeism and reminding him that he was expected to be at work on a regular basis. [*Id*. at ¶ 37.] On September 18, 2013, an investigation was conducted to determine whether Plaintiff fell asleep in his chair while on duty on September 5, 2013. [*Id.* at ¶ 38.] The investigation concluded that Plaintiff did fall asleep on duty and thus had violated System Bulletin No. 1, item 12. [*Id.*] Based on this violation and his past discipline record, on September 26, 2013, Plaintiff was issued a 15-day deferred suspension, which would remain on his record from September 26, 2013 until September 25, 2014. [*Id.*] Because he had a 10-day deferred suspension on his record at the time of the incident, he was required to serve that suspension from September 30, 2013 to October 9, 2013. [*Id.*] Plaintiff admitted that he fell asleep. [*Id.*] On December 30, 2013, Plaintiff's co-worker, Thomas Glodowski, sent him an email notifying him that he improperly booked an employee off on a PLD instead of medical leave. [*Id*. at ¶ 39.] On February 19, 2014 an investigation was conducted into whether Plaintiff violated the Company's attendance guidelines. [*Id*. at ¶ 40.] Because Defendant concluded that Plaintiff did in fact violate the attendance guidelines, and in light of his disciplinary record, he was issued a 5-day suspension. [*Id*.] At the time this discipline was issued, Plaintiff had a 15-day deferred suspension on his record, which he was required to serve as well. [*Id*.] Plaintiff was therefore suspended from March 5, 2014 through March 24, 2014. [*Id*.]

On May 19, 2014, Gary Anderson notified Plaintiff that he improperly tied an employee up, thereby causing an excessive service violation. [*Id.* at ¶ 41.] Gary Anderson coached Plaintiff that all callers need to ask crew members who call to tie up for both the time they were released

and the time they were relieved. [*Id.*] On July 17, 2014, Chief Caller Skye Woldhuis reminded Plaintiff that he needed to be more careful when "executing PLD or vacation." [*Id.* at 42.] On July 25, 2014, CMC Manager Sipla learned that an individual was left on spread pay during Plaintiff's shift and notified Plaintiff that the failure to annul him caused the company to owe him spread pay. [*Id.* at ¶ 43.] On July 30, 2014, Plaintiff was notified that an investigation would be held into his alleged failure to properly tie up a conductor on July 28, 2014, which resulted in an excessive service violation. [*Id.* at ¶ 44.] Plaintiff admitted that he made a mistake but rejected an offer to waive investigation. [*Id.*] An investigation was conducted and, as a result, management concluded that Plaintiff violated the system bulletin. [*Id.* at ¶ 45.] Based on this proven rule violation and Plaintiff's past disciplinary record he was issued a 20-day deferred suspension, on September 22, 2014, which was to remain on his record from July 28, 2014 through July 27, 2015. [*Id.*] Plaintiff did not believe his error "warranted this type of penalty." [*Id.*]

On September 2, 2014, Skye Woldhuis notified the CMC Managers that Plaintiff booked an employee off on vacation while he was properly on unpaid leave. [*Id.* at ¶ 46.] Gary Anderson followed up with Plaintiff and reminded him that he should check an employee's status before marking them off on vacation. [*Id.*] On November 26, 2014, CMC Manager Sipla notified Plaintiff that his failure to enter the proper rest time for a crew caused an "an excessive service violation and a lot of work for many people." [*Id.* at ¶ 47] Plaintiff admitted that Sipla may have been pointing out a mistake he made. [*Id.*] On December 5, 2014, Sipla notified Plaintiff that he entered the wrong task code in the computer system, which caused a train delay. [*Id.* at ¶ 48.] Plaintiff admitted that this was coaching from Sipla to help him do his job better. [*Id.*] On January 24, 2015, CMC Manager Sipla sent Plaintiff an email reminding him to "research the crews to see if their spread is open and use the oldest spread first." [*Id.* at ¶ 49.] On March 10, 2015, Plaintiff

"helped" the wrong employee onto an assignment and was notified of the error by Gary Anderson. [*Id*. at ¶ 50.] Plaintiff admitted that he made this mistake. [*Id*.] On March 14, 2015, CMC Manager Sipla informed Plaintiff that he failed to call a crew out for a job. On March 15, 2015, Plaintiff admitted it was an "oversight" on his part. [*Id*. at ¶ 51.] On April 2, 2015, Plaintiff improperly sent a taxi to the wrong hotel to pick up a crew. [*Id*. at ¶ 52.] The parties dispute whether this error caused any delay. For the purposes of this motion for summary judgment, the Court assumes that it did not.

On April 6, 2015, management discovered that Plaintiff failed to properly ensure that conductor (D.O.) and his associated engineer (M.R.) were used or annulled during their spread, and failed to properly notify his relief at the end of his shift that they were still available and on pay. [*Id*. at ¶ 53.] Plaintiff apologized for overlooking D.O. [*Id*.] A notice of investigation into the spread pay violation was issued on April 25, 2015. [*Id*.]

On May 11, 2015, someone failed to use or annul a crew, including conductor D.O., and failed to show the same crew on a turnover report, thus causing them not to be used or annulled for thirty-nine hours and entitled to excessive spread pay. [*Id*. at ¶ 54.] Although Defendant contends that Plaintiff was to blame for this error [*id*.], Plaintiff testified that there were others working at that time and contends that it would be unfair to assume Plaintiff is to blame. [39 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 54.] Again, for the purposes of this motion to dismiss, the Court credits Plaintiff's testimony, as he is the non-moving party. On May 27, 2015, a PLD was not executed for an employee B.H., who appeared available for work as a result. [28 (Def.'s Stmt. of Facts), at ¶ 55.] B.H. was then assigned to a job to which he did not appear because he was off work. [*Id*.] This caused a train delay. [*Id*.] Plaintiff testified that he's not sure what caused the

May 27, 2015 error, but speculates that it was a computer glitch. [39 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 55.]

On the morning of June 25, an investigation was conducted into allegations that, on April 6, 2015, Plaintiff failed to use or annul a crew and failed to list them on his turnover report, thereby causing excessive spread pay. [28 (Def.'s Stmt. of Facts), at ¶ 56.] On or about July 2, 2015, the Company informed Plaintiff that it had determined based on the investigation that he violated System Bulletin No. 1 and failed to follow supervisory instructions regarding turnover and spread pay procedures. [39 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 56.] Based on this conclusion and his past disciplinary record, Plaintiff was issued a 30-day actual suspension from service. [28 (Def.'s Stmt. of Facts), at ¶ 56.] Because Plaintiff had a 20-day deferred suspension on his record at the time, he was required to serve a total of 50 days, lasting from July 3, 2015 to August 21, 2015. [*Id.*] Plaintiff felt this disciplinary action was unfair because he was not the only person who could have prevented the excessive spread pay. [*Id.*]

On the afternoon of June 25, 2015, an investigation was conducted to determine Plaintiff's responsibility for failing to show an available train crew on his turnover report while their window was open, thereby causing excessive spread pay.[5] [28 (Def.'s Stmt. of Facts), at ¶ 57.] Plaintiff received a 30-day suspension, deferred for one year, as a result of the June 25 investigation. [39-1 (Pl. Dep. Tr.), at 227:18-22.][6]

---

[5] Plaintiff notes that this fact is supported by a different exhibit (Pl. Dep. Ex. 36) than that cited by Defendant (Pl. Dep. Ex. 34). [39 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 57.] Because Plaintiff recognizes that the fact is supported by evidence and not otherwise contradicted, the Court deems the fact admitted.

[6] Plaintiff disputes portions of Defendant's Statement of Fact No. 57 based on the fact based on the ground that the exhibit cited in the deposition testimony was not submitted by Defendant in support of their summary judgment motion. However, the deposition testimony itself supports this statement.

On June 27, 2015, Plaintiff was notified that an investigation would be conducted to determine his responsibility for allegedly failing to execute a PLD on May 28, 2015, and then allegedly cancelling and deleting the same, resulting in a significant train delay. [28 (Def.'s Stmt. of Facts), at ¶ 58.] On July 2, 2015, Hearing Officer Doyle Cowles reported that he found the charges substantiated for both investigations held on June 25, 2015. [*Id.* at ¶ 59.] After receiving the assessment from Cowles, Duncan contacted Plaintiff and asked him to meet with both Duncan and Morehouse for a discussion. [*Id.*] Plaintiff met with Duncan and Morehouse on July 3. [*Id.* at ¶ 60.] Morehouse led the meeting. [*Id.*] During the meeting, Morehouse told Plaintiff that she did not believe he was well suited for the crew caller position. [*Id.*] Morehouse expressed her concerns about the fact that both of the spread pay errors resulted in financial windfalls for D.O. and asked Plaintiff whether he intentionally left D.O. on pay and whether the two had any relationship. [*Id.*] Plaintiff denied both. [*Id.*] She also talked to Plaintiff about the spread pay errors and felt that he did not take them seriously. [*Id.*] Morehouse suggested that Plaintiff choose to resign and offered to give him a good reference if he did so. [*Id.*] Plaintiff chose not to resign, accepted the discipline, and signed the investigation notice for the alleged PLD error that took place on May 28, 2015. [*Id.* at ¶ 61.] On July 3, 2015, Plaintiff was issued a 30-day suspension for his failure to annual D.O. on April 6, 2015. [*Id.* at ¶ 62.] Because Plaintiff had a 20-day deferred suspension on his record, he was required to serve a 50-day suspension from July 3, 2015 to August 21, 2015. [*Id.*] Also on July 3, 2015, Plaintiff was issued a 30-day deferred suspension based on his failure to properly show a crew as available on his turnover, which resulted in the crew not being used and being entitled to excessive spread pay. [*Id.*] The investigation into the PLD error of May 28, 2015, was initially scheduled for July 15, 2015. [*Id.* at ¶ 63.] Plaintiff's

union, however, objected to conducting the investigation during his suspension, and the investigation was postponed until after his return from suspension. [*Id.*]

**D. Internal Complaints**

On or about August 21, 2014, Plaintiff alleged to Human Resources that he believed Gary Anderson abused his power and discriminated against Plaintiff by issuing racially-motivated disciplinary action against Plaintiff.[7] [*Id.* at ¶ 64.] Gary Anderson left his position as Regional Manager in March 2015. [*Id.* at ¶ 8.]

Duncan became Plaintiff's boss in June 2015. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 1.] On or about June 29, 2015, Plaintiff reported to Human Resources that he felt he was being harassed and discriminated against by Duncan, Sipla, and Rodriguez because he was trying to leave the department. [28 (Def.'s Stmt. of Facts), at ¶ 65.] However, Plaintiff never complained to HR that he believed Duncan's alleged harassment was racially motivated or that he felt otherwise racially discriminated against by Duncan. [*Id.* at ¶ 68.] Plaintiff disputes that assertion, noting that Defendant's Human Resources representative Angela Lee testified that Plaintiff made two internal complaints of discrimination. [39 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶¶ 65, 68.] But Plaintiff does not identity any testimony or evidence indicating that the June 29, 2015 complaint related to *racial* discrimination.

Lee investigated the allegations. [28 (Def.'s Stmt. of Facts), at ¶ 65.] Plaintiff never told anyone other than Lee about his complaint. [*Id.*] Lee interviewed Duncan, Sipla, and Rodriguez as part of her investigation [*id.* at ¶ 66], which Plaintiff contends was just her going through the

---

[7] Angela Lee from the Company's Human Resources department investigated the allegations and was unable to substantiate the allegations. [*Id.* at ¶ 64.] Plaintiff disputes that fact, not as unsupported by the evidence, but because the outcome of the investigation is a conclusion based on credibility determinations. The Court does not rely on this fact in resolving Defendant's motion for summary judgment.

motions of an investigation. The first time Duncan learned that Plaintiff raised a complaint against him was when he was interviewed on July 8, 2015.[8] [*Id.*] On July 27, 2015, Lee informed Plaintiff by letter that the investigation into his complaint had been completed and that the investigation was unable to conclude that any violation of the Company's Prohibited Harassment, Discrimination and Anti-Retaliation Policy occurred.[9] [*Id.* at ¶ 67.]

### E. Plaintiff's Transfer

On May 27, 2015, Plaintiff was awarded a new position as a tower operator, based on his seniority. [*Id.* at ¶ 69.] Defendant delayed Plaintiff moving into his new position in order to have him train other employees.[10] [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 26.] On July 14, 2015, Duncan notified Plaintiff by letter that he was released from his crew caller position and would start his tower operator job when he returned from suspension. [28 (Def.'s Stmt. of Facts), at ¶ 69.] Under the collective bargaining agreement applicable to crew callers, employees whose transfers were delayed were entitled to additional "hold down pay" while required to remain in their old position. [*Id.* at ¶ 70.] Plaintiff was not released to the tower operator position immediately because the

---

[8] Plaintiff cites to a July 3, email in which Duncan said something that—according to Plaintiff—indicated that he intended to retaliate against Plaintiff. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 12.] However, given that Plaintiff admits that Duncan did not learn about the complaint raised against him until July 8, 2015, the July 3, 2015 email cannot be evidence of a retaliatory motive.

[9] Plaintiff objects to this factual statement, again noting his position that Lee was just going through the motions of an investigation. Even if that were true, the fact that Lee sent Plaintiff a letter indicating that Defendant did not find any violation of the Company's Prohibited Harassment, Discrimination and Anti-Retaliation Policy also could be true. However, for the sake of clarity, the Court notes that it independently is evaluating Plaintiff's claims and is not relying on any conclusions Defendant reached regarding Plaintiff's discrimination complaints.

[10] Duncan submitted an affidavit indicating that Plaintiff's transfer was delayed so a replacement could be trained, not for Plaintiff personally to train employees. [42 (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 26.] For the purposes of this motion for summary judgment, the Court credits Plaintiff's testimony that he was asked to train employees.

CMC did not have enough trained crew callers to replace him at the time. [*Id.* at ¶ 71.] None of his responsibilities changed during this time. [*Id.*] He was released during his suspension, but his start date was further delayed due to the suspension. [*Id.*] It is not unusual to wait to release an employee to a new position until the employee is replaced. [*Id.*] He was paid for the delay according to the collective bargaining agreement and was released to the tower operator job upon his return from suspension. [*Id.* at ¶ 72.] He returned from suspension and started his new position on August 23, 2015. [*Id.*] It is Defendant's standard practice to continue to investigate performance issues or allegations of misconduct regardless of whether the employee involved is or is not still in the position that he or she was in when the issue arose. [*Id.* at ¶ 73.] Employees who transfer from one union position to another may still be subject to discipline for errors or misconduct committed while in the previous position after the transfer is completed. [*Id.*] Plaintiff would still have been subject to investigation for the incidents on April 6, May 11, and May 27, regardless of when he was released to his tower operator position. [*Id.*]

### F. Termination of Plaintiff's Employment

On September 1, 2015, an investigation was held to determine Plaintiff's responsibility for failing to execute a PLD day, which resulted in a significant train delay, and for cancelling and deleting the PLD in order to hide the error. [*Id.* at ¶ 74.] Plaintiff and Rodriguez both testified, but Duncan did not testify or attend. [*Id.*] Based on the investigation, Defendant determined that Plaintiff violated Company rules. [*Id.* at ¶ 75.] The termination of Plaintiff's employment was effective September 9, 2015, and he was notified the same day. [*Id.* at ¶ 76.]

Duncan could not identify any performance problems that Plaintiff was allegedly suffering from at the time of his termination. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 13.] At the time Plaintiff's employment was officially terminated, he had just been transferred to a new position, and Duncan

had no personal knowledge regarding Plaintiff's performance in that particular position. [39-2 (Duncan Dep. Tr.), at 21:2-18.] Duncan also admitted that, during most of the time that Plaintiff reported to him, Plaintiff was not even working. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 13.] Duncan became Plaintiff's manager in June 2015. [39-2 (Duncan Dep. Tr.), at 9:1-3.] As discussed above, Plaintiff was suspended beginning July 3, 2015, and did not return to the crew management department at the end of his suspension. [*Id.* at 21:17-22:8.] Duncan recommended termination of Plaintiff's employment based on the results of an investigation into misconduct that occurred prior to Plaintiff's suspension. [*Id.* at 23:17-23.]

Morehouse also admitted that she was not aware of Plaintiff having any performance deficiencies in his new position at the time he was terminated. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 17.] Morehouse could not identify any other instances where Defendant fired someone from a position based upon alleged performance deficiencies in performing the duties of their prior position. [*Id.* at ¶ 19.]

The parties dispute who made the decision to terminate Plaintiff. Morehouse, who then was Superintendent for the ROC, testified that it was her decision to terminate Plaintiff's employment. [39-3 (Morehouse Dep. Tr.), at 16:1-3, 33:1-12.] She submitted an affidavit averring that she made the decision to terminate Plaintiff's employment after receiving the transcript from the September 1, 2015 investigation into Plaintiff's alleged failure properly to execute a PDL. [29-4 (Morehouse Decl.), at 10, ¶ 21.] Morehouse further avers that, based on her review of the transcript, she concluded that Plaintiff failed properly to execute a PDL and then attempted to disguise his error. [*Id.*] Morehouse specifically testified that her decision to terminate Plaintiff "didn't have much to do with Tom Duncan either way. It was [her] decision." [*Id.* at 33:11-12.] In consideration of both his previous disciplinary record and his cavalier attitude towards

Defendant's concerns regarding his performance, Morehouse concluded that termination was the appropriate step. [39-3 (Morehouse Dep. Tr.), at 26:14-18, 47:18-21 (discussing the information she considered in deciding to terminate Plaintiff's employment).]

Morehouse did not typically work the same shift as Plaintiff, and he usually was there when she was gone. [39-3 (Morehouse Dep. Tr.), at 11:11-16; 33:18-25.] However, Morehouse was involved in managing the CMC after Gary Anderson retired and before Tom Duncan became regional manager. [29-4 (Morehouse Decl.), at 6, ¶ 4.] After Duncan assumed the regional manager position, she remained the superintendent in charge of the CMC. [*Id*. at 5, ¶ 2.] In that position, Morehouse was made aware of Plaintiff's performance issues and was aware of Plaintiff's disciplinary record at the time she chose to terminate his employment. [*Id*. at ¶¶ 15, 17, 18, 21.]

Plaintiff contends that Duncan made the decision to terminate him, either actually or functionally. In support of that position, Plaintiff contends that Duncan's colleague, Rodriguez, admitted that Duncan (her boss), made the decision to terminate Plaintiff. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 6.] But Rodriguez never testified that she knew it was Duncan's decision to terminate Plaintiff's employment. After Rodriguez testified that she did not think that Plaintiff was a good worker, she was asked why she did not herself terminate Plaintiff when she was his manager. [39-5 (Rodriguez Dep. Tr.), at 50:25-51:12.] Rodriguez testified that it would have been her supervisor Duncan's decision to terminate Plaintiff—not Rodriguez's decision. [*Id*. at 51:12-17.] But Rodriguez testified that she had nothing to do with the decision to terminate Plaintiff. [*Id*. at 58:3-5.] Nor did she talk with anyone about that decision. [*Id*. at 58:6-8.] Furthermore, she acknowledged that her belief that Duncan terminated Plaintiff's employment was speculation. [*Id*. at 58:9-12.] Still, Duncan testified that he recommended that Plaintiff be terminated to Morehouse.

[39-2 (Duncan Dep. Tr.), at 11:3-6.]  Duncan also testified that Morehouse did not follow his recommendation, she approved it.  [*Id.* at 12:16-20.]  Duncan further testified that he gave Plaintiff's new supervisor a heads up that Plaintiff was going to be fired "[o]nce [he] got sign-off from Morehouse that she was okay with it[.]"  [*Id.* at 24:8-10.]  Finally, it was Duncan who wrote and sent Defendant's termination letter to Plaintiff.  [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 18.]

Plaintiff is unable to identify a single similarly situated individual who was treated more favorably than he was treated.[11]  [28 (Def.'s Stmt. of Facts), at ¶ 77.]  Defendant has identified other non-probationary crew callers, outside of Plaintiff's protected class, whose employment was terminated while working under Duncan's supervision, including a white male (T.G.) and a white female (L.F.).  [28 (Def.'s Stmt. of Facts), at ¶ 78.]  Similar to Plaintiff, L.F.'s employment was terminated after she transferred out of the CMC for misconduct that occurred while she was employed as a crew caller.  [*Id.*]  Prior to their terminations L.F. and T.G. each had five and six instances of official discipline, respectively.  [*Id.*]  Plaintiff claims that the termination of his employment was part of a pattern of terminations of African American employees by Duncan.  [*Id.* at ¶ 79.]

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[11] Plaintiff disputes this fact and other related statements of fact proffered by Defendant.  For example, in opposing Defendant's assertion that the "best [Plaintiff] can do" is to "provide first names for three non-African American crew callers" without any explanation as to how they were treated better than Plaintiff, Plaintiff responds that he never was asked why he believed that they were treated better.  The Court need not determine whether that is the case, however, as Plaintiff still did not identify any similarly situated person in response to Defendant's motion for summary judgment.

242, 248 (1986).  In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  *Id.*  In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor (here, Plaintiff).  *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).  But Plaintiff "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'"  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation and quotation marks omitted).  Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, the moving party may meet its burden by pointing out

to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 324.

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Retaliation Claim

Plaintiff brings a Title VII retaliation claim against Defendant, arguing that his boss Duncan retaliated against him for making a discrimination claim against Duncan. Specifically, Plaintiff contends that Duncan terminated Plaintiff or was intimately involved in the decision to

terminate Plaintiff.[12]  "To state a retaliation claim under Title VII, 'the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two.'"  *Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018), reh'g denied (Sept. 25, 2018) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)). Defendant raises a number of arguments as to why Plaintiff's retaliation claim fails.

### i.    *Independent Decision Maker*

First, Defendant argues that Plaintiff's retaliation claim fails because Duncan was not the decision-maker with respect to Plaintiff's termination.  Defendant argues that there is at least an issue of fact regarding whether Duncan or Morehouse was the decision-maker with respect to Plaintiff's termination because (1) Duncan's colleague Rodriguez testified that it was Duncan who made the decision to terminate Plaintiff, and (2) other evidence indicates that Duncan was at least intimately involved in the final decision to terminate Plaintiff.  [41, at 2-4.]

With respect to the first argument, Rodriguez never testified that she knew it was Duncan's decision to terminate Plaintiff's employment.  After Rodriguez testified that she did not think that Plaintiff was a good worker, she was asked why she did not herself terminate Plaintiff when she was his manager.  [39-5 (Rodriguez Dep. Tr.), at 50:25-51:12.]  Rodriguez testified that it would have been her supervisor Duncan's decision to terminate Plaintiff—not Rodriguez's decision [*Id.* at 51:12-17.]  But Rodriguez testified that she had nothing to do with the decision to terminate Plaintiff.  [*Id.* at 58:3-5.]  Nor did she talk with anyone about that decision.  [*Id.* at 58:6-8.] Furthermore, she acknowledged that her belief that Duncan terminated Plaintiff's employment was

---

[12] Defendant's motion for summary judgment argues that Plaintiff's termination is the only adverse action Plaintiff can challenge, explaining why other possible actions (*e.g.*, the delay in transferring Plaintiff to his new position) do not amount to adverse employment actions for the purposes of Title VII.  Because Plaintiff does not argue that any other action amounts to an actionable, adverse employment action, the Court addresses Plaintiff's termination as the only adverse employment action at issue.

speculation. [*Id.* at 58:9-12.] Plaintiff "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant*, 870 F.3d at 568.

Defendant argues that even if Duncan did not make the final decision to terminate Plaintiff, he still was intimately involved in the decision-making process. To succeed on his retaliation claim, Plaintiff must demonstrate that "a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012). Plaintiff argues that even if Morehouse made the final decision to terminate Plaintiff,[13] a reasonable jury still could find that Duncan's retaliatory motive influenced her decision. However, in making this argument, Plaintiff does not discuss or even cite any cases addressing what showing is necessary to survive summary judgment under this theory. Plaintiff therefore has waived this argument. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

Regardless, the argument fails. An unbiased decision maker can break the casual chain. *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 866 (7th Cir. 2016) (affirming summary judgment of discrimination claim where the decision maker conducted independent investigation of alleged plagiarism, making subordinate's alleged animus "too remote" to support liability under a cat's paw theory); *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017), reh'g and suggestion for reh'g *en banc* denied (Sept. 28, 2017) (affirming summary judgment on Title VII claims based on the cat's paw theory where plaintiff failed to show that person with animus had any input or influence over the decision maker after submitting the case to the decision maker); see also *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006) ("[W]e have held

---

[13] Morehouse testified that she did not learn about Plaintiff's complaint about Duncan until Plaintiff was deposed. [39-3 (Morehouse Dep. Tr.), at 29:5-11.]

that an unbiased supervisor can break the causal chain by conducting an 'independent investigation' of the allegations against an employee.").

Here, Morehouse—the decision maker—relied upon the transcript from the September 1, 2015 investigation into Plaintiff's conduct. She submitted an affidavit averring that she made the decision to terminate Plaintiff's employment after receiving the transcript from the September 1, 2015 investigation into Plaintiff's alleged failure properly to execute a PDL. [29-4 (Morehouse Decl.), at 10, ¶ 21.] Morehouse further avers that, based on her review of the transcript, she concluded that Plaintiff failed properly to execute a PDL and then attempted to disguise his error. [*Id.*] Duncan did not testify at or attend the investigation.

Although Duncan recommended that Plaintiff be terminated, Plaintiff has not identified evidence from which a reasonable jury could conclude that Morehouse relied on that recommendation. Although Duncan testified that he gave Plaintiff's new supervisor a heads up that Plaintiff was going to be fired "[o]nce [he] got sign-off from Morehouse that she was okay with it" [39-2 (Duncan Dep. Tr.), at 24:8-10], Morehouse specifically testified that the decision to terminate Plaintiff "didn't have much to do with Tom Duncan either way. It was [her] decision." [39-3 (Morehouse Dep. Tr.), at 33:11-12.]

Plaintiff has not identified any evidence indicating that Morehouse delegated the factfinding portion of the investigation to Duncan. *Miller v. Polaris Labs., LLC*, 797 F.3d 486, 490 (7th Cir. 2015) ("An employer is liable under Title VII or Section 1981 when 'a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action.'" (quoting *Matthews v. Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir. 2014))). Nor has Plaintiff identified any evidence that Duncan provided Morehouse inaccurate information or failed to provide Morehouse relevant information, resulting in his

termination.  *Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 917 (2007) (cat's paw theory may be accepted where individual supplies "misinformation or fail[s] to provide relevant information to the person making the employment decision").  Although Duncan testified that Morehouse signed-off on his recommendation, Plaintiff has not identified any evidence indicating that Duncan had the foundation to testify about Morehouse's decision-making process.  Plaintiff does argue that Morehouse could not have done more than rubber stamp Duncan's recommendation because Morehouse did not work directly with Plaintiff and rarely even worked on the same shift as Plaintiff.  However, Morehouse's declaration makes clear that she reviewed the transcript from the September 1, 2015 investigation "in detail" before making her decision to terminate Plaintiff's employment.  [29-4 (Morehouse Decl.), at 10, ¶ 21.]  Because Morehouse based her decision to terminate Plaintiff on the transcript of the September 1, 2015 independent investigation into Plaintiff's conduct, Plaintiff's documented disciplinary history, and Morehouse's own meeting with Plaintiff, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.  *Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (affirming summary judgment because cat's paw theory of liability did not apply where supervisor conducted investigation prior to termination and did not rely solely on biased employee's information).

ii.    *Causal Link with Protected Expression*

Second, Defendant argues that even if Duncan was the decisionmaker with respect to Plaintiff's termination, Plaintiff's retaliation claim fails because Plaintiff has not identified any racial discrimination complaint from which a retaliatory motive can be inferred.  In order to establish his *prima facie* case of retaliation, Plaintiff must "offer proof of 'a causal link between the protected expression and the adverse action.'"  *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996) (citing *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1457 (7th Cir. 1994)).

Plaintiff's first internal complaint was on or about August 21, 2014, Plaintiff lodged a complaint against Gary Anderson, asserting that he abused his power and that the disciplinary action he issued Plaintiff was racially motivated. [28 (Def.'s Stmt. of Facts), at ¶ 64.] Gary Anderson left his position as Regional Manager in March 2015. [*Id.* at ¶ 8.] The termination of Plaintiff's employment was effective September 9, 2015. [*Id.* at ¶ 76.] Plaintiff has not identified any causal link between his termination and his August 2014 complaint against Gary Anderson, who left his position with Defendant approximately six months before Plaintiff was terminated. Without such evidence, the time lapse between the August 2014 complaint and Plaintiff's termination precludes a finding that Defendant retaliated against Plaintiff based on that complaint. To be sure, a lapse in time between protected conduct and adverse employment action alone does not bar a retaliation claim where there is other evidence of a causal link. *Veprinsky*, 87 F.3d at 891 ("If the plaintiff has evidence from which one may reasonably infer that her former employer waited in the weeds for five or ten years and then retaliated against her for filing [taking a protected action], we see no difficulty with allowing the case to go forward."). But where—as here—a plaintiff does not have "proof of a nexus between [his] protected activity and the employer's purported act of belated retaliation," disposal of the retaliation claim is appropriate. *Id.*; see also *Longstreet v. Ill. Dept. of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (finding four-month gap between protected conduct and adverse action insufficient to establish retaliation claim).

Plaintiff's second internal complaint was on or about June 29, 2015. [28 (Def.'s Stmt. of Facts), at ¶ 65.] Plaintiff complained that he felt that he was being harassed by Duncan, Sipla, and Rodriguez because he was trying to leave the department. [*Id.*] Defendant represents that Plaintiff never referenced race in this complaint. [*Id.*] Plaintiff disputes that assertion, noting that Defendant's Human Resources representative Angela Lee testified that Plaintiff made two internal

complaints of discrimination. [39 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 65.] However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to establish a retaliation claim. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). The testimony cited by Plaintiff does not indicate that Plaintiff's June 29, 2015 complaint was connected to any protected status by Plaintiff. Lee was asked whether she examined whether African-American employees were more likely to be disciplined (like Plaintiff) than Caucasians. [39-4 (Lee Dep. Tr.), 37:13-18.] Along those same lines, Lee was asked whether she tried to determine whether Caucasian employees were less likely to get disciplined (like Plaintiff) in similar circumstances. [*Id.* at 37:19-38:1.] Lee did not conduct any such analysis. [*Id.*] Lee did not testify that Plaintiff's June 29, 2015 complaint was at all related to race or any other protected status by Plaintiff.

### B.  Race Discrimination Claim

Plaintiff also brings a race discrimination claim against Defendant. "Under Title VII, an employer may not discriminate based on 'race, color, religion, sex, or national origin.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting 42 U.S.C. § 2000e-2(a)). "To succeed on a Title VII claim, the plaintiff-employee must prove three elements: '[1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class.'" *Id.* (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013)). The Seventh Circuit has made clear that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the

'indirect' evidence." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The relevant question therefore is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

Defendant argues that Plaintiff has not identified sufficient evidence for a reasonable jury to find that Duncan acted with any discriminatory, race-based motive when he caused Plaintiff to be terminated. Defendant devotes a significant portion of its briefing addressing whether Plaintiff can prove that his race caused his discharge under the framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 (1973), which requires that Plaintiff to provide evidence that: "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) at least one similarly situated employee not in his protected class was treated more favorably." *Watkins v. Riverside Med. Ctr.*, 2019 WL 643426, at *2 (7th Cir. Feb. 15, 2019) (citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017)). However, Plaintiff implicitly concedes that he cannot meet his burden under the *Douglas* framework, as Plaintiff does not even argue that he has identified at least one similarly situated employee not in his protected class that was treated more favorably.

Still, as discussed above, the relevant question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Plaintiff identifies the following "facts" in support of his contention that Duncan acted with a race-based motive:

1) Plaintiff testified that Duncan treated Plaintiff and Defendant's other African-American employees differently than white employees and with "disdain" like they were back in the civil rights era in the 1960s.

2) Plaintiff testified that Duncan was "blatant" with his discrimination towards Plaintiff and Defendant's other African-American employees.

3) Plaintiff testified that Duncan engaged in a pattern of discriminatory actions against Plaintiff's African-American colleagues.

4) Plaintiff testified that Duncan subjected other African-American employees to racism.

5) Duncan called Plaintiff "lazy" and "a liar."

6) Duncan also implied that Plaintiff was incompetent and would blame him for things that went wrong.[14]

7) Duncan fired five or six other African-American employees but did not fire any "nonblacks."

With respect to the first bullet point, the testimony Plaintiff cited regarding being back in the civil rights era of the 1960s was discussing Gary Anderson, not Duncan. Plaintiff did testify that Duncan showed disdain to Plaintiff and others. [*Id*. at 55:1-5.] When asked to provide examples, Plaintiff testified:

> The way he looked at us, the way that he spoke or did not speak. If he was walking through a door and he was in front of you, he wouldn't hold the door. He would just let the door close on you. Very – he just had a very bad attitude towards us, I thought. And, to me, it felt like it was because of our nationality.

[*Id*. at 55:16-23.] The Court does not see any discriminatory motive that can be inferred from Duncan's failure to follow etiquette (*i.e.*, holding the door open for people walking through behind him). And Plaintiff's conclusory allegation that he felt like Duncan looked at and spoke to him

---

[14] Plaintiff does not actually rely on this testimony. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Plaintiff also testified that Morehouse did the same thing—blaming Plaintiff for things that were not his fault. [39-1 (Pl.'s Dep. Tr.), at 61:15-62:2.] However, in his response brief, Plaintiff does not base his discrimination claim on claimed racially discriminatory conduct on the part of Morehouse. Even if he did, this argument would fail for the same reasons that it fails with respect to Duncan.

and others because of their nationality is insufficient to create an inference of discrimination at the summary judgement stage. See *Hoosier v. Greenwood Hospitality Mgmt. LLC*, 32 F. Supp. 3d 966, 976 (N.D. Ill. 2014) (granting summary judgment on Title VII claims because "[a] plaintiff's bare or conclusory assertion that an employer mistreated her because of her protected status" is not sufficient to demonstrate a causal link); *Hill v. St. James Hosp. & Health Centers*, 2013 WL 593954, at *6 (N.D. Ill. Feb. 15, 2013) (granting summary judgment where plaintiff stated "that she began to feel that there was a difference in how she was being treated because of her race," concluding that "such an observation alone without more does not create a triable issue"); see also *Winsley v. Cook Cty.*, 563 F.3d 598, 605 (7th Cir. 2009) (noting that "vague assertions" by a plaintiff regarding the more favorable treatment of other employees do not suffice to meet the plaintiff's burden of proof on summary judgment in the context of a Title VII discrimination claim). Similarly, with respect to the second, third, and fourth bullet points, Plaintiff fails to identify any evidence supporting his conclusory and vague assertions.

With respect to the fifth bullet point, Plaintiff does not identify any facts that would support the conclusion that Duncan calling Plaintiff "lazy" and/or a "liar" supports a finding of racial bias. *Barnes v. N. Indiana Pub. Serv. Co.*, 266 F. Supp. 3d 1110, 1117 n.4 (N.D. Ind. 2017) ("When deposed, [plaintiff] stated that he had been called 'lazy' and he assumed that the comment was based on his being black, but [plaintiff] did not provide any supporting facts for such a discriminatory inference to be drawn."). Plaintiff implies that those statements must be based on some kind of racial animus or bias because—according to Plaintiff—Duncan "rarely worked with" Plaintiff. [41, at 7.] However, Duncan was Plaintiff's boss and was involved in certain investigations of Plaintiff's conduct. Furthermore, Plaintiff does not identify any causal link between Duncan's comment and his termination. *Jones v. Nat'l Council of Young Men's Christian*

*Associations of the United States of Am.*, 48 F. Supp. 3d 1054, 1102 (N.D. Ill. 2014) (questioning whether calling someone "lazy" reflects a racial bias and concluding that discrimination claim failed because there was no evidence connecting comment to adverse action). Without more evidence demonstrating that Duncan acted with racial animus, his comments about Plaintiff being lazy and a liar alone are not sufficient to create a triable issue of fact. Similarly, with the sixth bullet point, Plaintiff has not identified evidence from which a reasonable jury could conclude that Duncan's implication that Plaintiff was incompetent and was to blame for certain mistakes was motivated by a racial animus.

Finally, with respect to the last bullet point, Plaintiff testified that he was aware that Duncan and Gary Anderson had fired five or more African American employees. But Plaintiff has not provided any factual details regarding the circumstances of their terminations. Furthermore, Duncan, who would have personal knowledge of whether he ever fired non-African-American employees, testified that he also has fired white employees. [42 (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 20; 29-2 (Duncan Aff.), at ¶¶ 15-16.] Again, this evidence is insufficient to allow a reasonable jury to conclude that Duncan acted with racial animus.

### C.    Non-Discriminatory Justification

Even if Plaintiff had established his *prima facie* discrimination and retaliation claims, Plaintiff's claims still would fail, as Defendant has identified a legitimate, non-discriminatory justification for his termination. If Plaintiff is able to establish his *prima facie* case of discrimination, the burden shifts back to the Defendant "to articulate a legitimate, non-discriminatory reason for terminating his employment." *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (citation omitted). Plaintiff then must present evidence that the proffered

reason is pretextual.  *Id*.  The same analysis applies to retaliation claims.  *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994).

Here, Defendant contends that Plaintiff's employment was terminated after an investigative hearing yielded evidence that he had violated a Company rule and then tried to cover up his conduct.  [29-4 (Morehouse Decl.), at 10, ¶ 21.]  In consideration of both his previous disciplinary record and his cavalier attitude towards Defendant's concerns regarding his performance, Morehouse concluded that termination was the appropriate step.  [39-3 (Morehouse Dep. Tr.), at 26:14-18, 47:18-21 (discussing the information she considered in deciding to terminate Plaintiff's employment).]  The Seventh Circuit has cautioned district judges about second guessing legitimate employment decisions, as a court "is not a super personnel department that second-guesses employers' business judgments."  *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016) (citation and quotation marks omitted).

Plaintiff argues that Defendant's argument fails because the undisputed evidence shows that neither Morehouse nor Duncan had any basis for finding that Plaintiff was not meeting the legitimate performance expectations of Defendant in the position he held at the time he was fired.  [39 (Pl.'s Stmt. of Add'l Facts), at ¶¶ 13, 17.]  Morehouse could not identify any other instances where Defendant fired someone from a position based upon alleged performance deficiencies in performing the duties of their prior position.  [*Id.* at ¶ 19.]  However, the fact that Plaintiff violated Company policy and then tried to cover up his conduct certainly is a legitimate reason for terminating an employee, even if the employee no longer is in the same position.

To be sure, Defendant could not simply use alleged misconduct in a prior position as a pretext for terminating Plaintiff.  But Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that is what Plaintiff did here.  Morehouse—the decision maker—

made the decision to terminate Plaintiff after she reviewed the results of an independent investigation into alleged misconduct. By the time the results of the investigation were released, Plaintiff already was in his new position. Even though Morehouse could not identify any other instances where Defendant fired someone from a position based upon alleged performance deficiencies in performing the duties of their prior position [*id*. at ¶ 19], that does not mean that Defendant was not justified in doing so here. Although Plaintiff does not address head on the issue of pretext in his response, he implies that the justification for terminating Defendant is pretextual because Defendant delayed Plaintiff moving into his new position in order to have him train other employees. [39 (Pl.'s Stmt. of Add'l Facts), at ¶ 26.] However, the results of the investigation into Plaintiff's conduct that Morehouse relief upon in deciding to terminate Plaintiff had not yet been released. To the extent that Plaintiff relies on his contention that his termination was the product of an incorrect assessment of the facts by the investigators and/or Morehouse, whether his actions were "properly considered errors and whether the discipline for them was proportionate is not for the Court to decide." *Tucker v. THC-Chi., Inc.*, 2017 WL 1197100, at *8 (N.D. Ill. Mar. 31, 2017). What matters is what the decisionmaker believed. See, *e.g. Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths," but "unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter." (citations omitted)). In sum, Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Defendant's justification for terminating Plaintiff's employment was pretextual.

## IV.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [26] is granted. Judgment will be entered in favor of Defendant and against Plaintiff.  Because this ruling resolves all claims in the case, this civil case will be terminated.

Dated: March 31, 2019

Robert M. Dow, Jr.
United States District Judge